IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| V. | : | CRIMINAL NUMBER 20-377-1 |
| | : | |
| AYOUB TABRI | : | |

**DEFENDANT'S SENTENCING MEMORANDUM AND**
**MOTION FOR DOWNWARD VARIANCE**

Ayoub Tabri, by and through counsel, Nancy MacEoin, Assistant Federal Defender, submits this memorandum to aid the Court in imposing a just sentence in this case. In late May 2020, protests erupted across the country after the death George Floyd at the hands of Minneapolis police officers. These protests were robust, as people were angry about police brutality against people of color. Many businesses and cities sustained substantial property damage from protestors who turned their anger into violence. On May 30, 2020, a protest occurred in Center City, Philadelphia, which migrated north on Broad Street. Mr. Tabri, who was visiting friends in Philadelphia from his home in Virginia, participated in this protest.

In the afternoon, the crowd convened on two Pennsylvania State Police vehicles parked at the entrance to I-76 to prevent the crowd from moving to the highway. Over the course of several hours, dozens of individuals damaged the police vehicles by beating them with objects, climbing on top of the vehicles, smashing the windows, and taking police equipment from inside the vehicles. At one point during this protest, Mr. Tabri made the very poor and regrettable decision to express his frustrations by picking up a flare from the street, lighting it, and throwing it into the already-broken window of a Pennsylvania State Trooper vehicle.

Mr. Tabri deeply regrets his actions that day. For the last 21 months, he has been incarcerated at the Federal Detention Center in Philadelphia and has thought about his actions

every day. He has been away from his family, unable to work, and burdened with the prospect of being deported to Morocco, a country he barely knows. Mr. Tabri's family is deeply distraught by his incarceration.

The defense submits Mr. Tabri has already served enough time to punish him for this offense upon consideration of all the 18 U.S.C. § 3553(a) factors. However, due to disparate immigration consequences which may befell Mr. Tabri if he is sentenced to time served, he respectfully requests this Court impose a sentence of 364 days followed by supervised release.

## I.     PROCEDURAL HISTORY

On October 29, 2020, Mr. Tabri turned himself in to agents from the Federal Bureau of Investigation after learning he had a warrant out for his arrest from his actions on May 30, 2020. Mr. Tabri willingly met with the agents, waived his *Miranda* rights, and freely admitted his conduct in throwing the flare into the police car. In this interview, he expressed his regret and remorse and explained that this occurred after a day of drinking and being angry about police violence and the murder of George Floyd. Additionally, he provided the agents his login and password for his iCloud account to assist the government in furthering its investigation.

Mr. Tabri was arrested that same day and has remained in custody ever since. Originally, the grand jury returned an indictment charging Mr. Tabri with two counts of arson in violation of 18 U.S.C. § 844(f)(1) and (2) and 844(i), one count of obstruction of law enforcement during a civil disorder in violation of 18 U.S.C. § 231(a)(3), and aiding and abetting in violation of 18 U.S.C. § 2.[1] While Mr. Tabri is a lawful permanent resident, he is not a United States citizen. As such, a criminal conviction for arson will be deemed an aggravated felony under 8 U.S.C. §

---

[1] A superseding indictment was later returned against both Mr. Tabri and an additional defendant, Lester Fulton Smith, with the same charges. Mr. Smith is accused of throwing a lit flare into the other side of the vehicle. The government does not allege that Mr. Tabri and Mr. Smith knew each other or coordinated their efforts in any way.

2

1101(a)(43)(E)(i). An aggravated felony designation forecloses nearly all forms of relief from removal including asylum and voluntary departure. It prescribes mandatory detention and permanently bars the individual from ever coming back to the United States.[2]

Upon consideration of the facts of this case, as well as the impact an aggravated felony would have on Mr. Tabri, the government extended a plea agreement allowing Mr. Tabri to plead guilty to obstruction of law enforcement during a civil disorder and aiding and abetting. At sentencing, the government will move to dismiss counts 1 and 2 of the superseding indictment. Additionally, the government acknowledges that Mr. Tabri receives a three-levels reduction in the offense level for having pleaded guilty and accepted responsibility for his conduct. Furthermore, Mr. Tabri agrees to pay $87,000 in restitution. PSR ¶¶ 5-9.

## II.  AYOUB TABRI'S PERSONAL HISTORY

Mr. Tabri is 25 years old, is a high school graduate, and an aspiring artist who hopes to work in photography and media production. At the young age of six, his family immigrated to the United States from Morocco after receiving a Diversity Visa. Mr. Tabri spoke no English when he arrived in the United States. Mr. Tabri was raised primarily by his mother, as his father has been in and out of the household most of his childhood, and when he was in the home, he was often violent. While Mr. Tabri reports that he did not endure abuse or neglect growing up, he describes being "punished" through physical violence. PSR ¶ 52. As recently as 2018, police were called to his family home for a domestic dispute. They found Mr. Tabri had intervened when his father attempted to physically assault his mother. No formal charges were brought against his father, but Mr. Tabri has not spoken to his father since. *Id.*, footnote 6.

---

[2] A summary of immigration consequences for individuals with aggravated felony convictions can be found here:
https://www.americanimmigrationcouncil.org/sites/default/files/research/aggravated_felonies_an_overview_0.pdf

As a child, Mr. Tabri felt like an outsider. He took ESL classes throughout elementary and middle school, and he was a minority in a predominantly white school. The family's limited finances did not allow him to participate in things other children were doing. PSR ¶ 51. Additionally, being the oldest child of an immigrant household, he often served as his parents' conduit as neither his mother nor father spoke English. At a young age, he was tasked with translating for his parents, helping them with adult tasks such as signing a lease, navigating the DMV, and translating for doctor visits. And while Mr. Tabri speaks Arabic, it is only in the limited capacity of interacting with his parents. He has had no formal education in Arabic and is functionally illiterate in the language. If he were deported, he would struggle to navigate as an adult in Morocco. Additionally, he has only visited Morocco a handful of times and while he has distant family there, he does not know them well.

After graduating high school, Mr. Tabri became active with fellow skateboard enthusiasts and often travelled to various cities on the east coast to skate and meet others in the community. In between working in restaurants, Mr. Tabri would travel to Philadelphia and other cities to skateboard and film and photograph other skateboarders. Shortly before his arrest, he was working on publishing a skateboarding magazine. Mr. Tabri plans to pursue a career in videography and media production in the future. Once he is released, he plans to return to Arlington, Virginia to reside with his mother and younger brother, and find employment wherever it is available.

In the interview with the Probation Officer on March 22, 2022, Mr. Tabri did not consider his use of alcohol or marijuana to be a problem for which he needed treatment. However, Mr. Tabri has been arrested twice in his life and both times they were related to his use of marijuana or alcohol. In 2015, he was cited for possession of marijuana and had to pay a

fine.³  And on May 30, 2020, he was drinking in the hours before his conduct in this case.  Mr. Tabri would benefit from drug and alcohol counselling and as such, it would be a beneficial condition of any supervised release imposed by this Court.

While serving the last 21 months in the Federal Detention Center, Mr. Tabri availed him of every education opportunity presented to him, including yoga, mind strength, civic lessons, business classes, sports instruction, art classes, and personal development.  PSR ¶ 72.  Additionally, he has not incurred a single disciplinary infraction in the past 21 months.  PSR ¶ 11.

### III.   THE SENTENCING GUIDELINE RANGE

The offense level, as calculated under USSG §§ 2X5.1 and 2K1.4, is 24.  PSR ¶ 30.  Adjustment under USSC § 3E1.1(a) and (b) brings the adjusted offense level to 21.  With a criminal history category of I, the recommended sentencing guideline range is 37 to 46 months.

### IV.   THE IMMIGRATION CONSEQUENCES OF THE SENTENCE IMPOSED

The defense respectfully submits that the 21 months Mr. Tabri has already served is a sentence that is sufficient, but not greater than necessary, to meet the statutory criteria of 18 U.S.C. § 3553(a).  However, due to immigration consequences of the sentence imposed, the defense requests that Judgment and Commitment Order not read "time served", as the Bureau of Immigration and Customs Enforcement will review the time Mr. Tabri already served as the final sentence.  In this case that is almost 21 months.  For the reasons cited herein, the defense respectfully requests the sentence imposed by 364 days.

---

³ The United States Probation Officer assessed one criminal history point for Mr. Tabri's 2015 conviction for possession of marijuana in Arlington County, Virginia.  PSR ¶ 41.  The only penalty imposed for that case was a fine.  It must be noted that starting July 2, 2021, possession of marijuana was legalized in Virginia.  The Cannabis Control Act states, "a person 21 years of age or older may lawfully possess on his person or in any public place not more than one ounce of marijuana or an equivalent amount of marijuana product[.]" Va Code Ann. § 4.1-1100 (2021).

Under 8 U.S.C. § 1101(a)(43)(S), an offense of obstruction of justice will be considered an aggravated felony if the sentence is over one year ("an offense relating to obstruction of justice, perjury or subornation of perjury, or bribery of a witness, **for which the term of imprisonment is at least one year**.") (emphasis added). The definition of "term of imprisonment" as used in the definition of aggravated felonies is found in 8 U.S.C. § 1101(a)(48)(B):

> (B) any reference to a term of imprisonment or a sentence with respect to an offense is deemed to include the period of incarceration or confinement ordered by a court of law regardless of any suspension of the imposition or execution of that imprisonment or sentence in whole or in part.

8 U.S.C. § 1101(a)(48)(B)(2012). Courts have interpreted this definition to be the sentence *actually imposed* by the court, regardless of how much time a defendant actually served. *See Carrington v. Attorney General of the United States*, 421 Fed. Appx. 232, 234 (3d Cir. 2011)(non-precedential)(the Bureau of Immigration Appeals did not err in holding that the language of 8 U.S.C. § 1101(a)(43)(R) refers to the sentence imposed, *not the time actually served*, in determining whether a criminal conviction is an aggravated felony under the INA) (emphasis added).

Courts have affirmed the same definition in other sections of 8 U.S.C. § 1101(a)(43) with identical wording. For example, in *United States v. Graham*, 169 F.3d 787, 791 (3d Cir. 1999), the Third Circuit held that a one-year sentence imposed for a theft crime was sufficient to meet the definition of an aggravated felony under 8 U.S.C. § 1101(a)(43)(G)[1]. In interpreting the language of 8 U.S.C. § 1101(a)(48)(B), the Court held that the definitional touchstone is "the

---

[1] 8 U.S.C. § 1101(a)(43)(G) uses the exact wording as subsection (R) in this regard: "(G) a theft offense...or burglary offense for which **the term of imprisonment [is] at least one year**." (emphasis added).

actual term imposed." *Graham*, 169 F.3d at 790; *see also United States v. Ilchuk*, 434 F.3d 618, 623 (3d Cir. 2006)("The actual term of the sentence imposed is ordinarily the definitional touchstone" in interpreting the language of 8 U.S.C. § 1101(a)(48)(B)); *United States v. Brooks*, 207 Fed. Appx. 205, 208 (3d Cir. 2006)(non-precedential)(in holding that a misdemeanor theft conviction meets the definition of an aggravated felony under 8 U.S.C. § 1101(a)(43)(G), the court held that the phrase "term of imprisonment" as used in the INA "relates to the actual sentence imposed..."); *Mekenye v. United States*, 445 Fed. Appx. 593, 595 (3d Cir. 2011)(non-precedential)(the language of 8 U.S.C. § 1101(a)(43)(G) refers to sentence imposed).  The Third Circuit's interpretation of 8 U.S.C. § 1101(a)(48)(B) is consistent with other circuits' interpretations that "term of imprisonment" as used in the aggravated felony definitions refers to the actual sentence imposed.  *See United States v. Echavarria-Escobar*, 270 F.3d 1265, 1268-1269 (9th Cir. 2001)(the language of 8 U.S.C. § 1101(a)(43)(G) and the addition of the definition of sentence under 8 U.S.C. § 1101(a)(48) indicates Congress's intent to keep the "sentence imposition" requirement for an aggravated felony, even after the 1996 amendments to the United States Code); *United States v. Maldonado-Ramirez*, 216 F.2d 940 (11th Cir. 2000)(the language of 8 U.S.C. § 1101(a)(48) indicates "term of imprisonment" in 8 U.S.C. § 1101(a)(43)(F) and (G) refers to sentence imposed).

In the context of removal proceedings, courts have held that a sentence changed or amended from one year or more to one less than 364 days removes the criminal conviction from the aggravated felony designation.  *See In Re Cota-Vargas*, 23 I. & N. Dec. 849 (2005)(the Bureau of Immigration Appeals terminated removal proceedings when the petitioner's sentence for a theft conviction was amended *nunc pro tunc* from 365 days to 240 days, as the conviction was no longer an aggravated felony under 8 U.S.C. § 1101(a)(43)(G) because the sentence was under one year); *Bayudan v. Ashcroft*, 298 F.3d 799 (2002)(the petitioner's conviction was no

longer a "crime of violence" aggravated felony as defined in 8 U.S.C. § 1101(a)(43)(F) as her sentence was amended from one year to 364 days). As a change in sentence from over a year to under 364 days is ground to re-open immigration proceedings because the conviction is no longer an aggravated felony, it is clear that the "term of imprisonment" language in the aggravated felony definitions refer to the sentence imposed.

As such, to avoid an aggravated felony designation, and all the consequences that will follow, including mandatory detention, deportation, and a permanent bar on returning to the United States, the defense respectfully requests the Court sentence Mr. Tabri to 364 days followed by supervised release.

V. **THE 21 MONTHS MR. TABRI HAS ALREADY SERVED IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY, TO MEET THE 18 U.S.C. § 3553(a) FACTORS**

For the reasons cited below, the defense submits that the 21 months Mr. Tabri has already imposed is sufficient to meet the statutory factors under 18 U.S.C. § 3553(a). Additionally, the defense respectfully requests this Court impose the specific sentence of 364 days so that this conviction does not become an aggravated felony under 8 U.S.C. § 1101(a)(43)(S).

A. The nature and circumstances of the offense and the history and characteristics of the defendant.

Mr. Tabri's actions on May 30, 2020, were undoubtedly serious. By throwing a lit flare into the vehicle, it posed a danger to the protesters and law enforcement in the immediate area and ultimately resulted in destruction of the police vehicle. It must be noted, however, that he did not commit this act in a vacuum. Dozens of protesters had already overrun the police vehicle, broken out the windows, damaged the body of the vehicle, and removed police equipment from inside the vehicle. Furthermore, Mr. Tabri did not come to Philadelphia, or to the protest, with the intent to set a police vehicle on fire. He traveled here to see friends and to

skateboard.  The protests happened to be occurring at the same time.  It was a spontaneous decision, made after a day of drinking and in the fervor of the angry protests against police brutality.[4]

Furthermore, Mr. Tabri was 23 years old when he committed this offense.  Scientific research regarding adolescent brain development shows that the brain continues to mature and develop into one's mid-twenties.  *See* Coalition for Juvenile Justice, *What are the Implications of Adolescent Brain Development in Juvenile Justice*, (2006) at 4, 18.[5]  Functional magnetic resonance imaging (fMRI) shows that the prefrontal cortex of the brain is the last area of the brain to mature.  *CJJ report*, at 7.  This area of the brain governs reasoning, advanced thought, and impulse control.  *Id*.  fMRI shows that the prefrontal cortex continues to mature into a person's early to mid-twenties.  *Id.*  Culpability or blameworthiness can be defined by how well a person understands the likely ramifications of one's own actions and the degree of control one has to counteract impulses and peer pressure.  The MacArthur Foundation Research Network on Adolescent Development and Juvenile Justice concludes that young offenders are too susceptible to outside influences and vulnerable to their own developmental weaknesses to be considered as blameworthy or culpable as adults.  *Id.* at 12.

The United States Supreme Court, in holding that sentences of death and life without parole for non-homicide offenses violate the Eighth Amendment, has expressly recognized that

---

[4] As Officer LF stated to the United States Probation Officer, "The riots – because of George Floyd – us as officers, we had nothing to do with it.  But people wanted to be heard, and they lump all law enforcement into one anyway." PSR ¶ 24.

[5] This report is available at http://www.juvjustice.org/media/resources/resource_138.pdf (hereinafter "*CJJ report*"); *see also* Paul Thompson, *Time-Lapse Imaging Tracks Brain Maturation from ages 5 to 20*, National Institute of Mental Health and the University of California, Los Angeles (May 2004); Rebecca L. McNamee, *An Overview of the Science of Brain Development*, University of Pittsburgh (May 2006).

9

younger individuals are less culpable than adults. *See Roper v. Simmons*, 543 U.S. 551 (2005); *Graham v. Florida*, 130 S. Ct. 2011 (2010). In *Roper*, the Supreme Court explained that juvenile offenders possess a "lack of maturity and an underdeveloped sense of responsibility," they are "more vulnerable or susceptible to negative influences and outside pressures," and their "character[s] are not as well formed as that of an adult." *Roper*, 543 U.S. at 569-70 (citations omitted). Subsequently, the Supreme Court reiterated these widely-accepted concepts in *Graham*, noting that "no recent data provide reason to reconsider the Court's observations in *Roper* about the nature of juveniles." *Graham*, 130 S. Ct. at 2026. The Court specifically stated that "[a] juvenile is not absolved of responsibility for his actions, but his transgression 'is not as morally reprehensible as that of an adult.'" *Id*. (quoting *Thompson v. Oklahoma*, 487 U.S. 815, 835 (1988)); *see also Gall*, 552 U.S. at 58 (holding that it was reasonable for the district court to consider the defendant's immaturity at the time of his offense as a mitigating factor at sentencing).

In 2012, the Supreme Court extended this reasoning to all juveniles, regardless of the crime they committed, when it held that sentencing a juvenile to life without parole violates the Eighth Amendment. *Miller v. Alabama*, 567 U.S. 460 (2012).

> Of special pertinence here, we insisted in these rulings that a sentencer have the ability to consider the "mitigating qualities of youth." *Johnson v. Texas*, 509 U.S. 350, 367, 113 S. Ct. 2658, 125 L. Ed. 2d 290 (1993). Everything we said in *Roper* and *Graham* about that stage of life also appears in these decisions. As we observed, "youth is more than a chronological fact." *Eddings*, 455 U.S., at 115, 102 S. Ct. 869, 71 L. Ed. 2d 1. It is a time of immaturity, irresponsibility, "impetuousness[,] and recklessness." *Johnson*, 509 U.S., at 368, 113 S. Ct. 2658, 125 L. Ed. 2d 290. It is a moment and "condition of life when a person may be most susceptible to influence and to psychological damage." *Eddings*, 455 U.S., at 115, 102 S. Ct. 869, 71 L. Ed. 2d 1. And its "signature qualities" are all "transient." *Johnson*, 509 U.S., at 368, 113 S. Ct. 2658, 125 L. Ed. 2d 290.

*Id*. at 476.

While Mr. Tabri was not a juvenile when he was arrested in this case, the Supreme Court's reasoning is especially persuasive and equally pertinent in his case in light of the scientific research indicating the parts of the brain which govern reasoning, advanced thought, and impulse control are not fully developed until one's mid-twenties. Mr. Tabri's prefrontal cortex, which governs impulse control and the ability to understand consequences of actions, may not have been fully developed when he committed this offense. His conduct showed that he was acting spontaneously, with little understanding of the consequences of his actions. Additionally, he was drinking that day. As Mr. Tabri admits, he made a spontaneous decision which he did not think through. Since his arrest, Mr. Tabri has had 21 months to reflect on his actions that day. He is remorseful, apologetic, and is looking forward to moving on with his life, focusing on his career, and making amends with his family.

  B. <u>The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and provide just punishment for the offense</u>.

The 21 months Mr. Tabri has already served is sufficient to account for the seriousness of the offense, to promote respect for the law, and to provide just punishment. This is Mr. Tabri's first time ever being incarcerated. And he has served this time at the Federal Detention Center in Philadelphia, a pretrial holding facility run with penitentiary-level security. Furthermore, Mr. Tabri has served the entire 21 months of incarceration during the COVID pandemic. This has limited programing at the Federal Detention Center and limited social visits. Additionally, due to outbreaks of COVID variants, inmates have been subjected to rolling quarantines and lockdowns, sometimes requiring inmates to be in their cells sometimes for 23 hours a day. Mr. Tabri has endured his time at the Federal Detention Center as productively as he can, taking whatever courses offered, meditating, and assisting other inmate in whatever way he could. He

has used this time wisely to reflect on his actions, his drug and alcohol use, and focus on how he wants to live once he is released.

      C. <u>The need for the sentence imposed to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant</u>.

This conviction, regardless of the sentence imposed by this Court, will deter Mr. Tabri from ever committing a criminal offense again.  As stated *supra*, if the sentence imposed is over 364 days, it will be deemed an aggravated felony as defined in 8 U.S.C. § 1101(a)(43)(S), making Mr. Tabri deportable and closing virtually all avenues of relief.  However, even with a sentence of 364 days, Mr. Tabri will never be free of immigration consequences from this conviction because it may be considered a crime involving moral turpitude.[6]  Should he ever travel outside of the country again, he will be subject to detention upon return to the United States, having sustained a conviction under 18 U.S.C. § 231, should it be deemed a crime involving moral turpitude, would make him inadmissible to the United States.  8 U.S.C. § 1182(a)(2)(A)(i)(1).  One conviction for a crime involving moral turpitude does not deem Mr. Tabri deportable because he has been in the United States longer than five years.  8 U.S.C. § 1227(a)(2)(A)(i)(1).  However, a second conviction for a crime involving moral turpitude will place Mr. Tabri in deportation proceedings.  8 U.S.C. § 1227(a)(2)(A)(ii).

As such, this conviction, regardless of the sentence this Court imposes will provide substantial and sufficient deterrence to prevent Mr. Tabri from committing any crimes in the future. This conviction will have ramifications for him the rest of his life as he will not be able to leave the country without risk of detention and possibly denied admission to the United States.

---

[6] Defense counsel could not find any caselaw directly determining whether a conviction under 18 U.S.C. § 231(a)(3) a crime involving moral turpitude.  In *Ildefonso-Candelario v. Attorney General of the United States*, 866 F.3d 102 (3d Cir. 2017), the Third Circuit held that a violation of 18 Pa.C.S. § 5101 (obstructing the administration of law or other governmental function) is not a crime involving moral turpitude.  However, the two crimes are not categorically analogous.

These consequences are in addition to the important civil rights Mr. Tabri no longer possesses, such as the right to serve on a jury, hold certain professional licenses, and in some jurisdictions, his right to vote.  Therefore, the conviction itself, regardless of the sentence imposed, provides a tremendous deterrent for Mr. Tabri to committing crimes in the future.

    D. <u>To provide the defendant with needed educational or vocational training, medical care, or other correction treatment in the most effective manner</u>.

While Mr. Tabri has availed himself of any learning opportunities presented to him at the Federal Detention Center, he has not been able to participate in long-term treatment for drug and alcohol abuse.  He is looking forward to participating in such programing on an out-patient basis which can be ordered as part of his supervised release.  He does not need to remain incarcerated to avail himself of this type of treatment.

    E. <u>The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct</u>.

Despite coming to the United States at six years old, growing up in the United States, and considering this his home country, Mr. Tabri's conviction could result in deportation to a foreign country where he does not fully speak the language, and does not know anyone besides distant relatives.  This is not a consequence for an individual charged with the same conduct, who has the same criminal history background, but who is a United States citizen.  Also, had Mr. Tabri's parents become United States citizens before he turned 18 years old, he would have become a citizen also under derivative citizenship.  However, for unknown reasons, they did not do that.  And while Mr. Tabri should have started the process to become a United States citizen when he became an adult, he did not understand the dramatic consequences a conviction could have on his status as a lawful permanent resident.

Sentencing Mr. Tabri to 364 days incarceration followed by supervision will avoid the discrepancy between the consequences of Mr. Tabri's conviction and the conviction of an

individual of the same offense with the same criminal history because it will avoid the aggravated felony designation.

    F.   <u>The need to provide restitution to any victims of the offense</u>.

In the plea agreement, Mr. Tabri agrees to pay $87,000 in restitution for the property of the Pennsylvania State Police which was destroyed in the protest and through his actions of lighting the flare and throwing it into the police vehicle.

## VI.   **CONCLUSION**

Mr. Tabri stands before this Court humbled and remorseful for his conduct on May 30, 2020. He has spent 21 months reflecting on his actions and hoping to return to his mother and brother in Arlington, Virginia. For all the reasons cited herein, as well as any which may become apparent to the Court at the sentencing hearing, the defense respectfully requests the Court impose a sentence of 364 days incarceration in this case, followed by supervised release.

                                          Respectfully submitted,

                                          <u>/s/ Nancy MacEoin</u>
                                          NANCY MacEOIN
                                          Assistant Federal Defender

**CERTIFICATE OF SERVICE**

    I, Nancy MacEoin, Assistant Federal Defender, Federal Community Defender Office for the Eastern District of Pennsylvania, hereby certify that I filed the attached Defendant's Sentencing Memorandum and Motion for Downward Variance via the Court's Electronic Fiilng (ECF) system, which sent notification to Christine E. Sykes and Vineet Gauri, Assistant United States Attorneys, by delivery to their office located at 615 Chestnut Street, Suite 1250, Philadelphia, Pennsylvania 19106, via her email address Christine.Sykes@usdoj.gov and via his email address Vineet.Gauri@usdoj.gov.

        /s/ Nancy MacEoin
        NANCY MacEOIN
        Assistant Federal Defender

DATE:     July 11, 2022